## Samuel M. Treat v. Daniel Bates and another.

*Riparian rights: Drainage: Natural flow.* A riparian owner has the right of drainage into the stream opposite his own lands, of such of his land as requires it, and has the right to the natural flow of the stream for that as well as for other purposes.

*Riparian owner: Dam: Equitable relief.* Any dam below, which sets back the water to his injury, is a violation of his rights, and may be made the ground of equitable relief.

*Experts: Theories: Facts.* Where the facts are brought out by distinct and reliable proofs, the theoretical statements of experts as to the scientific possibility of such facts are of little account. Facts cannot be destroyed by theories.

*Equitable relief: Homestead: Nuisance.* Ownership of a homestead seriously affected by a nuisance injurious to health, is a sufficient special interest to give a right to equitable interference.

*Nuisance: Abatement: Homestead.* And where the partial abatement of a dam would prevent the overflow of complainant's land, but its entire abatement was necessary to abate a public nuisance affecting his homestead, a decree for such complete abatement was affirmed.

*Heard May 15.　Decided July 11.*

Appeal in Chancery from Branch Circuit.

*John B. Shipman* and *Jonas H. McGowan*, for complainant.

*L. T. N. Wilson* and *G. V. N. Lothrop*, for defendants.

CAMPBELL, J.

The bill was filed to restrain the defendants from restoring or maintaining a dam on the west branch of Coldwater river, and below the lands of complainant. It appears that complainant owns about five hundred acres of land lying east of the river, and having a river front of not far from three quarters of a mile, on sections 7 and 8 in town seven south, of range six west, in the town of Ovid, Branch county; the lands fronting on the river, beginning near the north line of section seven, and extending south to the line running east and west through the middle of the south-east quarter of that section, the river forming the western boundary. The dam in question is half a mile north of and below the complainant's northern boundary. There is also a mill-race leaving the river a little north of the middle of the north-east quarter of section seven, and running west of and parallel to the river, ending just below the dam, and furnishing water to the same grist and saw mill intended to be supplied by the dam. A dam was first built by Philo H. Crippen in 1848. In 1853 it was abated as a public nuisance under an indictment, while used by Silas N. Card. The evidence tends to prove that the dam was several times partially restored and torn down, before the race was made in 1861, which still continues, and is saved by the decree. In the latter part of 1868 defendants rebuilt the dam in violation of an injunction, and in the summer 1869 it was carried away during a freshet. This bill was filed shortly after, complaining of the threatened reconstruction as a nuisance to health, and an injury to complainant's lands, which had been overflowed and damaged by the dam when standing.

Complainant's house stands at the north end of his premises, and east of the river a considerable distance on section 8, and exposed during west winds to all exhalations

from the dam.   On the same section, and south of his house, is a large tract of low land running from north-east to south-west, approaching the river at the south end within about thirty rods, and separated from it by some-what higher ground.   A ditch runs from the southerly part of this marsh across complainant's land, striking the river at the quarter-line of section seven, called in the tes-timony the *old ditch,* and dug many years ago.   Two other ditches striking the river further north at intervals of about 80 rods apart, and known as the middle and north ditches, have been dug more recently.   The latter enters the river at the north line of section seven, where there is a high-way, and a bridge known as Lockwood's bridge.

The middle branch of the Coldwater river enters the west branch just below the south line of section eight, and there are mills on this middle branch at some distance above the mouth.   A little above the south line of section eight is a lake known as Teachout Lake, about half a mile long, of which the west branch forms the outlet.   South of Teachout Lake, and connected with it by a narrow stream of about a quarter of a mile long, is another large lake, known as Big Lake.   This connecting stream is crossed by a highway at a point called Long's bridge.

The overflowing of complainant's lands, against which protection is sought, is alleged to come chiefly by water setting back through the ditches into the large marsh, which it is claimed would be drained and available for various farm purposes, if not drowned.   It is also alleged that the soil being underlaid by quicksand, the raising of the stream affects it injuriously by setting back water wherever the quicksand is reached.   It is also claimed that the river borders are overflowed and made swampy by raising the dam.

The injury to health is claimed to arise from the over-flowing of the low lands and the saturation of the soil with stagnant water, and the exposure of wet land by alternately raising and drawing down the water in running the mills.

The defence rests on a denial of most of the injurious

consequences relied on, which so far as existing are claimed to be owing to other causes than the dam. A right of flowage was also relied on under deeds of former proprietors owning up to the quarter line of section seven. Those deeds conveyed this right up to that point so long as the dam should be used for hydraulic purposes, subject to the conditions that no more than ten acres of land should be covered, that the water should not be raised above the surface of the lakes, and so as not to overflow the marshes in the vicinity of the lakes. The lands north of the quarter line were purchased by complainant after those deeds were made, and in 1868, when there was no dam, and when the mills had been running by means of the race, since 1861.

One of the principal questions of fact arises concerning the effect of the dam upon the river and lands above the quarter line. Below that the rights of flowage depend on different claims; above that there is no right shown.

Upon this issue there is contradictory testimony. And the truth can only be got at by comparing the facts testified to.

The theory of the defense is that most of the overflow complained of would have taken place without any reference to the dam, by reason of the low and swampy nature of the ground; that the river banks were hard ground, and high enough to contain the water if actually raised by the dam, and that the effect of the ditch was to cut through a natural barrier which shut out the river from the swamp.

The complainant seeks to trace all the difficulty to the dam.

There is much testimony concerning the condition of the land and surroundings during the continuance of the dam, and during the time when it was down. There are also scientific and other measurements of the height of the surface of the stream, and of the ground at various points, and estimates of the effect of the dam and other erections, based on hydraulic rules. Upon some of the facts and on the scientific deductions there is a want of agreement.

27 MICH.—50.

After giving the voluminous record repeated examinations and comparisons, we think it is fairly to be drawn from the evidence, that the dam as previously existing was higher than the ordinary surface of the stream at the quarter line when the dam was down, by about six inches; that the natural bank on complainant's land at that point was not far from a foot in height, and not over that; that the surface of the marsh was as much as twenty inches higher than the river at .the quarter line where the old ditch terminated, which would give a fall between the marsh and the river at the rate of between six and seven feet to the mile. The natural fall between the quarter line and the dam, was between four and five feet. If the surveys are at all reliable, the old ditch ought to have made an efficient outlet for any water on the surface of the swamp and for some distance below, and there is such proof, though contradicted.

The evidence shows clearly that the marsh was not a quagmire, but reclaimable land, and that it had been so reclaimed as to be valuable for grass, and in places for wheat. It also shows that the wheat crop was drowned out after the raising of the dam, and that while the dam was up much of the marsh was saturated with water.

The defendants, however, claim that the old ditch was cut through a belt of high land, and that even if the water set back from the river, it was because the ditch had improperly exposed the back lands to a danger they would have otherwise escaped, and that without it the stream would have kept within its banks.

There is evidence tending strongly to show that the land back from the river was higher than the swamp, and might have operated as such a barrier. There is, however, a good deal of evidence tending also to show that the swamp had a natural outlet about where the ditch was dug, and that this was only an improvement of it. The nature of the vegetation would also indicate that there was some, though imperfect, natural drainage, and there is no proof of any other natural outlet. If this point became essential,

we are not sure that the weight of evidence would not establish the ditch as on the original line of drainage.

But there can be no doubt of the right of a riparian owner to drain his own lands through his own lands into the adjoining stream. And it is equally clear that unless he has parted with it, he has a right to the use of the stream in its natural flow, and a right to prevent any such interference with the natural flow as will work material injury to any of his legal privileges. It can make no difference whether the injury to his premises will be greater or less than if he had chosen to leave them in a state of nature, if the encroachment is not warranted. He has a full claim to be protected in any lawful use of his own possessions.

The only question, in regard to these upper lands, must be whether the dam will raise the water upon them to his prejudice. This is a question of fact.

There is no room on the proofs to doubt that if the dam should be kept up and filled, the water, if it should keep at a dead level, would rise far enough to create some obstruction to the ditch, and that by this same thing he would lose the help of a running stream to facilitate the drainage. And upon the same theory that water will not rise above a dead level, the rise would be increased by the height of the sheet falling over the dam, which would be sufficient—if as thick as the witnesses suppose—to make up with the other a height of about a foot, which would be even, at ordinary stages, with the banks, if it did not flood them, and would entirely fill the mouth of the ditch, and oppose a body of dead water to its flow, and flood more or less of the bordering lands back of the ridge. But the evidence is convincing that when the dam was up, its effect was felt throughout the whole stream, not only up to Teachout Lake, but through that to Long's bridge and Big Lake, and that the water was in like manner set back into the marsh so as to affect most, if not all of it, very injuriously. The evidence on this head is so clear and

consistent that we cannot doubt its truth. Much of the evidence to the contrary relates to temporary overflows from natural causes. There is perhaps some that cannot be harmonized with the facts alleged by complainant's witnesses. So far as this conflict goes, the impression left upon our minds by the proofs is, that the complainant's claim is made out.

The scientific testimony upon the extent of the backing up of water in such a stream is, as courts frequently find it, not to be reconciled. That water will set back in such a stream as this was, when it is dammed up, is, at least, very generally believed, and appears to be an accepted fact in hydraulic science. Whether the rules for calculating its extent, in such a stream of varying width and depth and velocity, can be got at with certainty, is a question we do not feel called upon to consider. In the present case the question is not in any way theoretical. The effect of damming has been observed, and the effect of removing a dam has been noted by persons having full means of observation; and who observed carefully. The fact has been established, that raising the dam flooded these lands, and removing it cleared them of the flood. No theory can change the facts, and we need no aid of science to confirm the proofs of eye-witnesses.

We think the complainant has shown that any dam which would be of any use to defendants will flow his lands to his serious detriment, and that he is entitled to prevent its erection.

A minor question is raised under the decree, as erroneous because requiring the whole dam to be abated. This could not be sustained on the mere ground of injury to complainant's lands by flowing them. The evidence of damage in the cause is not based on any such partial obstruction. But there are some considerations which would prevent defendants from any right to a reversal on this account.

The bill rests on the ground of a public as well as

private nuisance, and complainant's ownership of a home-stead locally affected by it is such a special interest as would, according to the general course of authorities, allow him to complain of it as a special grievance to him. Whether, in such a case, the judgment of abatement under an indictment would be conclusive evidence of nuisance, we need not determine. It would at least dispense with the necessity of again remitting the cause to a jury, before pro-ceeding in equity. The right to maintain the dam, so far as it is derived from the grants, is confined to the time when it is to be used for hydraulic purposes. As it can not be used for any such purpose effectually when reduced to the dimensions in which the flood left it, it becomes a mere useless and pernicious obstruction to the natural course of the stream, which can benefit no one, and which produces a pool that is shown to be, in some degree, at least, detrimental to the health of the neighborhood. We do not think the decree should be interfered with on this ground.

The other Justices concurred.