SHERIDAN ROAD BAPTIST CHURCH v DEPARTMENT OF
EDUCATION

Docket No. 69050. Submitted October 7, 1983, at Detroit.—Decided
February 7, 1984. Leave to appeal applied for.

The State Superintendent of Public Instruction instituted pro-
ceedings to determine whether operation of private schools run
by the Sheridan Road Baptist Church and First Baptist Church
of Bridgeport should be suspended for the schools' failure to
meet statutory requirements regarding curriculum and teacher
certification and their refusal to submit school records to the
state upon demand. The two churches, their pastors, a teacher,
and several parents of students at the schools brought an
action for declaratory and injunctive relief. Defendants were
the Michigan Department of Education and the Superintendent
of Public Instruction. Plaintiffs claimed that the state curricu-
lum, teacher certification, and reporting requirements violated
the First Amendment guarantee of free exercise of religion by
depriving them of the liberty to carry out their mission of
Christian education and that the requirements necessitate
excessive entanglement between government and religion. The
Ingham Circuit Court, Ray C. Hotchkiss, J., held that the
regulations at issue interfered with plaintiffs' practice of their
religious beliefs, that defendants failed to show that teacher
certification was a reasonable means to carry out a legitimate
state interest, that the curriculum standards were invalid

REFERENCES FOR POINTS IN HEADNOTES

[1, 4] 16A Am Jur 2d, Constitutional Law §§ 471-473.
  Supreme Court cases involving establishment and freedom of reli-
    gion clause of Federal Constitution. 37 L Ed 2d 1147.
[2] 16A Am Jur 2d, Constitutional Law § 476.
[3] 16A Am Jur 2d, Constitutional Law § 468.
[5, 6, 8] 68 Am Jur 2d, Schools §§ 229, 231, 283.
  Validity of state regulation of cirriculum and instruction in private
    and parochial schools. 18 ALR4th 649.
  What constitutes a private, parochial or denominational school
    within statute making attendance at such school a compliance
    with compulsory school attendance law. 65 ALR3d 1222.
[7] 16A Am Jur 2d, Constitutional Law §§ 466, 468, 469.
[9] 16 Am Jur 2d, Constitutional Law § 220.

because they do not ensure uniform educational quality, and that the regulations in question are unconstitutional because they cause excessive entanglement with religion. The court upheld the state's authority to investigate the schools' records but ruled that the information could be used only for statistical and comparison purposes. The court subsequently enjoined enforcement of the regulations as to the plaintiffs, Carolyn Stell, J. Defendants appeal, alleging several errors. *Held:*

1. Plaintiffs' schools apparently comply fully with the curriculum standards demanded by the defendants. Further, the state does not seek to regulate the content of textbooks or the manner in which courses are taught in the schools. Any burden placed on plaintiffs' beliefs by the curriculum standards is not significant.

2. Similarly, there is no showing that compliance with the teacher certification requirement would render the mission of the schools impractical or impossible.

3. The state has a proper interest in providing an education for its youth. This interest is of sufficient urgency to be classified as "compelling" within the constitutional standard that any intrusion upon a religious practice can be justified only if there is a "compelling state interest". When the state's interest is balanced against the minimal burden placed upon the plaintiffs by the regulations at issue, the regulations are found to be a reasonable means of giving effect to the broader state interest of providing an education to all children and are, thus, a reasonable exercise of state authority in the field of education.

4. The regulations at issue do not necessitate excessive governmental entanglement with religion.

5. The trial court erred in restricting the state in the use of the information gathered from the schools.

6. The curriculum requirements are not unconstitutionally vague. They are as reasonably precise as the subject matter permits, given the public interest in local participation in formulation of educational programs.

7. Plaintiffs have not shown any actual infringement of their rights by the actions of local school boards.

Reversed and remanded with instructions.

1. CONSTITUTIONAL LAW — RELIGION — PRACTICE OF RELIGION.

A three-part inquiry is utilized to determine whether the government has impermissibly infringed upon a person's right to practice his religious beliefs: first, whether the belief is religious in nature; second, whether the government regulation imposes any burden on the free exercise of religion; and third,

whether some compelling state interest justifies the burden placed upon the right.

2. CONSTITUTIONAL LAW — RELIGION — PRACTICE OF RELIGION — BURDEN OF PROOF.

The party alleging a violation, by government regulation, of his First Amendment right to the free exercise of religion has the burden of proving that the regulation in question imposes a burden or restriction on the exercise of his religious beliefs.

3. CONSTITUTIONAL LAW — STATUTES — RELIGION — APPLICATION OF STATUTE.

The fact that a law relating to religion does not compel a violation of conscience or that it applies to a general category of conduct is not alone determinative of its validity; a regulation neutral on its face may, in its application, nevertheless offend the constitutional requirement of governmental neutrality if it unduly burdens the free exercise of religion, even if the burden is only indirect.

4. CONSTITUTIONAL LAW — RELIGION.

The state will be permitted to intrude upon an individual's religious freedom, even if a compelling secular interest is shown, only if alternative, nonintrusive means are not available.

5. SCHOOLS — PRIVATE SCHOOLS — STATE'S INTEREST IN EDUCATION — REQUIREMENTS FOR PRIVATE SCHOOLS.

The state has a proper interest in the manner in which private schools perform their secular educational function, and is empowered to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction.

6. SCHOOLS — PRIVATE SCHOOLS — STATE'S INTEREST IN EDUCATION — REQUIREMENTS FOR PRIVATE SCHOOLS.

The interest of the state in providing an education for its youth is of sufficient urgency to be classified as "compelling" within the constitutional standard that any intrusion upon religious practice can only be justified if there is a "compelling state interest"; the state's regulations regarding curriculum and teacher certification requirements in nonpublic schools are a reasonable means of giving effect to that compelling state interest and are a reasonable exercise of state authority in the field of education.

7. STATUTES — CONSTITUTIONAL LAW — RELIGION.

A statute, in order not to be violative of the Establishment Clause of the First Amendment, must have a secular legislative purpose, must have a principal or primary effect that neither advances nor inhibits religion, and must not foster an excessive government entanglement with religion (US Const, Am I).

8. SCHOOLS — PRIVATE SCHOOLS — CURRICULUM REQUIREMENTS — CONSTITUTIONAL LAW.

Curriculum requirements imposed by the state upon nonpublic schools are no more vague than those imposed upon the public schools and are as reasonably precise as the subject matter permits; the requirements are not unconstitutionally vague (MCL 380.1561[3][a]; MSA 15.41561[3][a]).

9. STATUTES — JUDICIAL CONSTRUCTION — CONSTITUTIONAL LAW.

A statutory scheme should not be invalidated merely because it may be susceptible to an unconstitutional interpretation; whenever possible an interpretation that does not create constitutional invalidity is preferred to one that does.

*Ball & Skelly* (by *William B. Ball* and *Philip J. Murren),* and *Michael E. Thomas,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Gerald F. Young* and *Richard P. Gartner,* Assistants Attorney General, for defendants.

Amici Curiae:

*Miller, Cohen, Martens & Sugerman, P.C.* (by *Mark H. Cousens* and *Paul L. Kleinbaum),* for the Michigan Federation of Teachers.

*Steven F. McDowell* and *Jeffrey R. Portko,* for the Catholic League for Religious and Civil Rights.

*Foster, Swift, Collins & Coey, P.C.* (by *James A. White* and *William K. Fahey),* for the Michigan Education Association.

Before: M. J. KELLY, P.J., and HOOD and SHEP-
HERD, JJ.

SHEPHERD, J. Defendants appeal from the trial
court's finding that state laws requiring certifica-
tion of teachers in nonpublic schools, and mandat-
ing certain courses and curriculum standards in
such schools, violate plaintiffs' right to freely exer-
cise their religious beliefs, US Const, Am I, and its
order enjoining enforcement of the same as to
plaintiffs. In his written opinion, the trial judge
also held that the treacher certification require-
ment and state supervision of parochial schools
cause "excessive government entanglement with
religion" in violation of the First Amendment to
the United States Constitution, *supra.* We disagree
and reverse.

The Legislature has placed supervision of non-
public schools within the authority of the defen-
dant superintendent of public instruction:

"The superintendent of public instruction is hereby
given supervision of all the private, denominational and
parochial schools of this state in such matters and
manner as is hereinafter provided. * * * It is the intent
of this act that the sanitary conditions of such schools,
the course of study therein, and the qualifications of the
teachers thereof shall be of the same standard as pro-
vided by the general school laws of the state." MCL
388.551; MSA 15.1921.

A person employed as a teacher in such a school
is required to hold "a certificate such as would
qualify him or her to teach in like grades of the
public schools of the state". MCL 388.553; MSA
15.1923. Certification requirements are determined
by the State Board of Education, MCL 380.1531;
MSA 15.41531, and are set forth in 1979 AC, R
390.1101 *et seq.* An applicant for a teaching certifi-

cate must have completed "not less than 40 semester hours in a program of general or liberal education". R 390.1122(1), and must hold a bachelor's degree from a college or university approved by the State Board of Education. R 390.1125(1). Provision is made for certification of applicants who attended accredited institutions in other states. R 390.1130, R 390.1154.

The compulsory education provision of the state School Code of 1976, MCL 380.1561(3)(a); MSA 15.41561(3)(a), reads in part as follows:

"A child shall not be required to attend the public schools in the following cases:
"* * * A child who is attending regularly and is being taught in a state approved nonpublic school, which teaches subjects comparable to those taught in the public schools to children of corresponding age and grade, as determined by the course of study for the public schools of the district within which the nonpublic school is located."

Local school boards are charged with determining the courses of study to be pursued in each school district. MCL 380.1282; MSA 15.41282. The only nonpublic school courses specifically mandated by the state are Federal and State Constitution and Government and high school Civics. MCL 380.1166; MSA 15.41166. The state's regulation of nonpublic school curricula consists of a simple review of the availability of various academic courses. The Department of Education has determined that plaintiffs' schools offer courses comparable to those of public schools. The curriculum review does not include an evaluation of teaching techniques or course content.

Nonpublic schools are required to submit records of enrollment, courses of study and teacher qualifi-

cations upon demand by the state. A school's failure to comply is "considered sufficient cause to suspend the operation of said school" following notice and a hearing before the state superintendent. MCL 388.555; MSA 15.1925, MCL 388.554; MSA 15.1924.

On December 8, 1980, plaintiffs filed a complaint for declaratory and injunctive relief alleging, *inter alia,* the following:

(1) The plaintiffs include a teacher, pastor, parents, and churches who adhere to a fundamentalist Christian faith;

(2) Plaintiffs have established two Christian schools for their children;

(3) The schools "are Christian enterprises which are conducted as an integral part of [plaintiffs'] religious mission";

(4) The schools "involve substantial religious activity and purpose" and do not divide instruction into religious and secular components and;

(5) The schools "employ teachers who are subject to the direction and discipline of religious authority which necessarily pervades the school".

It is further alleged that the defendant superintendent had instituted proceedings to determine if the schools' operation should be suspended for failure to meet statutory requirements and that plaintiffs had refused to comply for reasons of religious conviction, as compliance "would substantially limit and interfere with the religious mission of the churches". Plaintiffs claimed that imposition of the curriculum and certification requirements would violate the free exercise clause of the First Amendment by depriving them of the liberty to carry out their religious mission of Christian education, without a compelling state interest in the imposition of such requirements. They also

claimed that "the requirements necessitate excessive entanglement between government and religion". Plaintiffs prayed for issuance of an *ex parte* temporary restraining order forbidding enforcement of the requirements, as well as permanent injunctive relief. The trial court granted the temporary restraining order the same day but vacated it on December 22, 1980, upon an agreement by defendants to refrain from further administrative action against plaintiffs pending the court's final decision.

Defendants filed an answer and counterclaim on February 17, 1981, seeking mandatory injunctive relief against plaintiffs' refusal to submit school records to the state. MCL 388.555. A six-day nonjury trial was held.

Both of the schools operated by plaintiffs offer a kindergarten through twelfth grade program. Each school offers courses in a wide variety of secular, academic subjects, including civics, American goverment, mathematics, English, and science. The schools employ some teachers who have complied with the certification requirement and some who have not. The State Department of Education annually requests reports from nonpublic schools on enrollment and teacher qualifications but plaintiffs refused to submit such records to the state during the 1979-1980 academic year.

Plaintiffs believe that sovereignty is a religious concept under which only God, not the state, is supreme over man. They believe any attempt by the state to control or license their educational "ministry" is an infringement on their religious liberty. The also object to state control over their school curricula because, according to plaintiffs, it could force them to teach objectionable matter or interfere with religious teaching. They believe that

reporting student enrollment to the state is synonymous with state control. While their religion does not prevent them from hiring certified teachers, it forbids them from consenting to the state's requirement that teachers in their schools be certified. Plaintiffs contend that the "humanistic" education courses which are requisite to obtaining certification conflict with their own biblical beliefs. In short, the plaintiffs are opposed to any effort by the state to dictate the qualifications of the teachers employed by, or courses taught in, their schools.

Plaintiffs called as witnesses two experts in the field of education, each of whom criticized teacher certification requirements as ineffective guarantors of adequate performance. One of these experts went so far as to state that certification actually produces mediocrity. Defendants' expert witness testified that, without certification, there would be no safeguard against incompetence but admitted lacking knowledge of any study showing a correlation between certification and teacher performance.

The trial judge found the religious beliefs of plaintiffs to be sincere and that the state regulations at issue interfered with the practice of those beliefs. He concluded that "[d]efendants have failed to show that teacher certification is a reasonable or effective means to carry out a legitimate state purpose". In addition, he held the curriculum standards invalid because they do not ensure uniformity in educational quality in the state but "merely [require] that nonpublic schools be as good as, or as bad as, the public schools in the district". The trial judge noted the interest of local school districts "in maintaining enrollment in the public schools since each student lost [i.e., to

parochial schools] means substantial loss of revenue for that district". The court held also that the regulations cause excessive government entanglement with religion and, therefore, MCL 388.551 and 388.553 are unconstitutional. The court upheld the state's authority to investigate the records of nonpublic schools, MCL 388.555, but ruled that the information thereby obtained "may be used for statistical and comparison purposes only". The trial judge's successor entered a judgment reflecting the trial judge's written opinion.

I

THE CURRICULUM AND TEACHER CERTIFICATION
REQUIREMENTS DO NOT VIOLATE PLAINTIFFS'
RIGHTS UNDER THE FREE EXERCISE CLAUSE OF THE
FIRST AMENDMENT

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof". The free exercise clause was made applicable to the states in *Gitlow v New York,* 268 US 652; 45 S Ct 625; 69 L Ed 1138 (1925). In *Sherbert v Verner,* 374 US 398, 403-407; 83 S Ct 1790; 10 L Ed 2d 965 (1963), the Court applied a three-part inquiry to determine whether the government had impermissibly infringed upon the appellant's right to practice her religious beliefs: first, whether the belief, or the conduct motivated by the belief, is religious in nature; second, whether the state regulation imposes any burden on the free exercise of religion; and third, whether some "compelling state interest" justified the burden placed upon the First Amendment right. 374 US 398, 406.

In applying the first part of the *Sherbert* test, it

should be noted that "to have the protection of the Religion Clauses, the claims must be rooted in religious belief". *Wisconsin v Yoder,* 406 US 205, 215; 92 S Ct 1526; 32 L Ed 2d 15 (1972). Writing for the majority in *Murdock v Pennsylvania,* 319 US 105, 109; 63 S Ct 870; 87 L Ed 1292 (1943), Justice Douglas rejected the notion "that any conduct can be made a religious rite and by the zeal of the practitioners swept into the First Amendment". Here, however, defendants concede and the evidence is uncontroverted that plaintiffs' objections to state regulation of their schools are firmly rooted in the fundamentalist doctrine to which they adhere. While not all Christian denominations share plaintiffs' perceptions of the educational implications of their particular view of religion, it remains true that the fundamentalist doctrine of plaintiffs is a *religious* doctrine within the meaning of the term religion as found in the United States and Michigan Constitutions and any interference with plaintiffs' beliefs by the state must satisfy the stringent demands placed upon the state before such interference can be constitutionally justified.

"The party alleging a First Amendment violation has the burden of proving that the regulation in question imposes a burden or restriction on the exercise of his or her religious beliefs." *Hough v North Star Baptist Church,* 109 Mich App 780, 783; 312 NW2d 158 (1981). "Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against [the party] in the practice of [its] religion." *Abington School Dist v Schempp,* 374 US 203, 223; 83 S Ct 1560; 10 L Ed 2d 844 (1963). The fact that a law does not compel a violation of conscience or that it applies to a general category of conduct does not

end the inquiry. "A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement of governmental neutrality if it unduly burdens the free exercise of religion." *Yoder, supra,* 406 US 205, 220; *Thomas v Review Board of the Indiana Employment Security Division,* 450 US 707, 717; 101 S Ct 1425; 67 L Ed 2d 624 (1981). Furthermore, the law may be invalid on this ground even though the burden is only indirect. *Sherbert, supra,* 374 US 398, 404.

In this case, plaintiffs claim the curriculum regulations and teacher certification requirement place an unlawful burden on the exercise of their beliefs, and the trial judge so held. It appears that plaintiffs' schools fully comply with the curriculum standards demanded by defendants. Plaintiffs' objection is based on the belief that the state has no right to regulate their school programs in any manner. However, the state does not seek to regulate the content of textbooks used or the manner in which courses are taught in the schools. We therefore believe that any burden on plaintiffs' beliefs is not constitutionally significant. Similarly, the teacher certification rule has not prevented plaintiffs from hiring teachers who meet their specifications as well as the state's qualifications. Persons who earn degrees from accredited, private colleges and universities may qualify for teacher certification. In addition, "an applicant may satisfy any educational requirement for certification by presenting evidence of an equivalent as determined by the state board". 1979 AC, R 390.1152. Equivalence may be based on college graduation, scores on standardized examinations, or prior teaching experience. *Id.* Emergency, temporary permits may be issued for persons "with reasonable qualifications when failure to authorize the

permit will deprive children of an education". R 390.1145.[1]

Plaintiffs have no religious objection to having their children taught by certified teachers. Once again, it is the very concept of state regulation which they abhor. There is no showing that compliance with the requirement would render the mission of their schools impractical or impossible.

Posed against this minimal burden is the state's interest in the quality of education. "When state action results in a denial of one's legitimate exercise of religious freedom, the state must show an overriding interest of the highest order to justify that action." *Fisher v Fisher,* 118 Mich App 227, 231; 324 NW2d 582 (1982). This Court must "searchingly examine" the state's interest and the detrimental effect that might result from exemption of plaintiffs from the regulation. *Yoder, supra,* 406 US 205, 221. "Even if a compelling secular interest is shown, the state will be permitted to intrude upon an individual's religious freedom only if alternative, nonintrusive means are not available." *Fisher, supra,* pp 231-232, citing *Sherbert, supra,* 374 US 398, 407.

The present state constitution declares that "[r]eligion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged". Const 1963, art 8, § 1. This provision, "coupled with the fact that legislation in

---

[1] At oral argument, we asked the Assistant Attorney General whether the plaintiffs' schools may hire otherwise qualified, noncertified teachers who meet plaintiffs' religious standards so long as such teachers undertook to qualify for certification subsequent to being hired. The Assistant Attorney General replied that he understood this to be so. We interpret R 390.1145 to authorize such a procedure if plaintiffs demonstrate any difficulty in obtaining religiously qualified personnel. As so interpreted, the statutory and regulatory scheme imposes no undue hardship on plaintiffs in seeking prospective teachers who share their fundamentalist religious views.

this State upon the subject of education has from the beginning been of the most liberal character, indicates a settled purpose on the part of the State to provide, foster, and protect educational facilities for all". *Dennis v Wrigley,* 175 Mich 621, 625; 141 NW 605 (1913). "It has always been the policy of this State, as indicated by the provisions of its Constitution and a long line of legislative enactments, to encourage the cause of education." *Michigan Female Seminary v Secretary of State,* 115 Mich 118, 120; 73 NW 131 (1897).

On several occasions, the United States Supreme Court has assumed that this strong state interest in the education of its youth extends to private as well as public schools. In *Pierce v Society of Sisters,* 268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925), the Court stated:

"No question is raised concerning the power of the state reasonably to regulate *all schools,* to inspect, supervise, and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare." 268 US 510, 534. (Emphasis added.)

"Since *Pierce,* a substantial body of case law has confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction." *Board of Education v Allen,* 392 US 236, 245-246; 88 S Ct 1923; 20 L Ed 2d 1060 (1968) (citations omitted). The state "has a proper interest in the manner in which

[private] schools perform their secular educational function". 392 US 247. See, also, *Lemon v Kurtzman,* 403 US 602, 614; 91 S Ct 2105; 29 L Ed 2d 745 (1971); *Everson v Board of Education,* 330 US 1, 18; 67 S Ct 504; 91 L Ed 711 (1947); *Meyer v Nebraska,* 262 US 390, 402; 43 S Ct 625; 67 L Ed 1042 (1923).

The courts of other jurisdictions, when faced with similar issues, have held in favor of the state. See cases collected in 18 ALR4th 649 *et seq.* In *State ex rel Douglas v Faith Baptist Church,* 207 Neb 802; 301 NW2d 571 (1981), *app dis,* 454 US 803 (1981), a parochial school refused to request state approval on the ground that the state had no authority over its operation since it was an extension of a church ministry. The Nebraska Supreme Court, noting "the critical interest which the State has in the quality of the education provided its youth", upheld the state's teacher certification and curriculum requirements. 207 Neb 817; 301 NW2d 579. "Although parents have a right to send their children to schools other than public institutions, they do not have the right to be completely unfettered by reasonable government regulations as to the quality of the education furnished." *Id.* The Nebraska laws relating to curriculum, like those at issue here, are "very minimal in nature", requiring only that certain subjects be taught. "There is no effort to dictate in what manner that knowledge shall be imparted." *Id.*

*State v Shaver,* 294 NW2d 883 (ND, 1980), also involved issues similar to those presented by the instant litigation, namely, the validity of state laws requiring teacher certification and mandating that certain courses be offered. The school in question employed no certified teachers and the people concerned with it were, for religious rea-

sons, "vehemently opposed to securing state approval required by state law". 294 NW2d 893. However, the school's curriculum, like plaintiffs' here, met state requirements. Thus, the school opposed state regulation but did "not forbid compliance with any of the specific requirements" of state law. 294 NW2d 895. The North Dakota Supreme Court found the burden on free exercise of religion "minimal". "The incidental burden on the free exercise of the parents' religion as a result of the state approval requirement is justified under the circumstances by the state's compelling interest in the regulation." 294 NW2d 897. Accord, *State v Rivinius,* 328 NW2d 220 (ND, 1982), *cert den,* 75 L Ed 2d 948 (1983); *Meyerkorth v State,* 173 Neb 889; 115 NW2d 585 (1962), *app dis,* 372 US 705 (1963); *New Jersey State Board of Higher Education v Shelton College,* 90 NJ 470; 448 A2d 988 (1982).

There have been several cases in which statutes governing nonpublic schools were held invalid. However, the regulations under attack were so intrusive and all encompassing as to virtually abolish the distinction between public and private schools or render the existence of the latter impossible, thus depriving parents of their right to direct the education of their offspring under the Due Process Clause of the Fifth and Fourteenth Amendments. *Pierce, supra.* In the case of *Farrington v Tokushige,* 273 US 284, 293-295; 47 S Ct 406; 71 L Ed 646 (1927), the statute governing foreign language schools prohibited their operation before "or during the hours while the public schools are in session", forbade attendance in such schools for more than one hour per day or six hours per week, gave the State Department of Education authority to establish the complete cur-

ricula in the schools, and prohibited the use of any textbooks "other than as prescribed or permitted by the department".

In *State v Whisner,* 47 Ohio St 2d 181; 351 NE2d 750 (1976), the Ohio Supreme Court held that the state's standards relating to the operation of schools infringed upon the parents' right to freely exercise their religion. The standards allocated instructional time "almost to the minute", *Wisner,* p 206, and required "'all activities' of a nonpublic school to conform to policies adopted by the board of education". *Whisner,* p 207. Additionally, the state required religious schools to cooperate with elements of their surrounding communities. *Whisner,* p 209. *Whisner* was distinguished by the Court in *Shaver, supra,* 294 NW2d 898, which observed: "The Ohio minimum standards were self-contradictory and extreme in their effort to achieve equivalency in public and private education."

There has been no showing in this case that the burden placed on plaintiffs' schools by state regulation is as onerous as in the above-cited cases. The state does not regulate the manner in which courses are taught in the schools, require prior state approval of textbooks, or intrude upon the scheduling of classes in the schools. Certain courses must be offered but once the curriculum requirements are met the schools are free to infuse all courses with ther religious beliefs and they are free to offer whatever additional courses they wish. The laws "are not designed to interfere with any religious ritual or practice, and do not work a penalty against any theological position". *Gillette v United States,* 401 US 437, 462; 91 S Ct 828; 28 L Ed 2d 168 (1971).

The plaintiffs cite *Kentucky State Board for*

*Elementary & Secondary Education v Rudasill,*
589 SW2d 877 (Ky, 1979), *cert den* 446 US 938
(1980), in which the Kentucky Supreme Court held
that the state's teacher certification, textbook ap-
proval, and school accreditation requirements vio-
lated the Kentucky Constitution. The court relied
solely upon a section of the state bill of rights
providing that no man "be compelled to send his
child to any school to which he may be conscien-
tiously opposed". 589 SW2d 877, 879. There is no
similar section in the Michigan Constitution.

Plaintiffs contend that there is no evidence that
teacher certification ensures high quality of in-
struction and their expert witnesses so testified at
trial. Indeed, the effectiveness of certification in
this regard is somewhat open to question:

"The certification process in most states involves the
mere mechanical adding up of the credit hours the
applicant has had in Education and in other subjects,
no matter what their quality might be. If he is short of
the stipulated amounts, regardless of any other possible
qualifications, he cannot be certified (except in some
cases as an 'emergency' or 'substandard' teacher). Thus
are created those legendary and amusing anomalies of
certification: the fact that Einstein could not be licensed
to teach third-grade arithmetic, or that a learned
Frenchwoman could not be admitted to teach French in
any American public school, or that Leonard Bernstein
would not be competent to teach music to any public
school student, or that many professors of Education,
those who teach teachers how to teach, could not them-
selves be licensed to teach in any public school.

"There is no very precise way of measuring the
deleterious effects of the obtuse administration of certi-
fication laws, but a good deal of individual testimony
exists, for what it is worth, to the effect that the
brightest students find these laws a severe deterrent to
entering teaching, as do many mature people who could
bring to the classroom a lifetime of experience and

accomplishment but who happen not to have any Education courses on their record and who cannot face the prospect of getting any. How well the licensing laws still fill their original function of saving the schools from incompetent teachers is not clear. The incompetent teacher today is a great deal more competent, with a great deal more education, than was the incompetent teacher in the early days of certification, when he might have no work beyond high school and often not that much. Today incompetence means chiefly the lack of Education courses. In view of the quality of teachers who *are* often certified today with a full complement of Education courses and then some, and in view of the quality of person who is often not certifiable despite a first-rate liberal education and demonstrated intellectual achievements—one wonders just what kind of incompetence public schools are now being saved from by the state departments of Education." Koerner, *The Miseducation of American Teachers* (Boston: Houghton Mifflin Co, 1963), ch 7, pp 207-208. (Emphasis in original.)

Plaintiffs argue that a less intrusive means of guaranteeing educational quality is available, namely, standardized testing of students. However, the validity of such examinations is itself an issue and the tests may be administered too late to remedy the harm they are meant to prevent. We also note that standardized testing would very likely be designed to test secular subjects, would have a nonreligious orientation, and would enable the state to become as much or more involved with the manner of teaching courses as the existing regulatory scheme. As noted by the Court in *Rivinius, supra,* 328 NW2d 220, 229:

"We recognize that neither certified teachers nor standardized testing are perfect means to insure the end sought to be attained. Neither one is an exact science, but is concerned with probabilities. Each

method which purports to measure learning can be questioned as to its validity.

"Standardized testing ordinarily does not result in the discovery of a deficiency in education until after the term, semester, or the school year is over, which would, in effect, result in a child wasting its period of time if the results of the standardized test indicated that the child's education was deficient. We do not believe such a result would satisfy the state's interest in educating its youth.

"Although we are cognizant that teacher certification may also have its deficiencies, we believe that teacher certification is an acceptable method of satisfying part of the constitutional mandate to the legislature to properly provide an education for its youth."

The people of this state also have a strong interest in regulating various professions, including the teaching profession. "That the State through the legislature may provide for the licensure and regulation of professions * * * in which the public interest is very great, is not open to question." *Fowler v Bd of Registration in Chiropody,* 374 Mich 254, 256; 132 NW2d 82 (1965). To require the state to prove conclusively that certification of the teaching profession guarantees excellent performance would severely inhibit its legislative authority. "The courtroom is simply not the best arena for the debate of issues of educational policy and the measurement of educational quality." *Shaver, supra,* 294 NW2d 900. In *Faith Baptist, supra,* 207 Neb 816-817; 301 NW2d 579, the Nebraska Supreme Court noted as follows:

"We are not suggesting as an absolute that every person who has earned a baccalaureate degree in teaching is going to become a good teacher, any more than one who has obtained the appropriate training and education will become a good engineer, lawyer, beauty operator, welder, or pipefitter. However, we think it

cannot fairly be disputed that such a requirement is neither arbitrary nor unreasonable; additionally, we believe it is also a reliable indicator of the probability of success in that particular field. We believe that it goes without saying that the State has a compelling interest in the quality and ability of those who are to teach its young people."

The court below concluded that the curriculum standards do not further the state's interest in education because they do not mandate statewide uniformity. The judge cited no authority for the proposition that uniformity is essential in order for a state regulation to pass constitutional muster. Michigan has followed a long tradition of local administration of public schools. "The policy of the State has been to retain control of its school system, *to be administered throughout the State under State laws by local State agencies organized with plenary powers to carry out the delegated functions given it by the legislature."* *Lansing School Dist v State Board of Education,* 367 Mich 591, 595; 116 NW2d 866 (1962). (Emphasis added.) "The Michigan educational structure * * * in common with most States, provides for a large measure of local control." *Milliken v Bradley,* 418 US 717, 742; 94 S Ct 3112; 41 L Ed 2d 1069 (1974). The state holds a strong interest in local participation in educational policy making, as it "permits the structuring of school programs to fit local needs", and encourages competition for excellence in education. *Id.*

Perhaps more importantly, the record reveals that plaintiffs would object to the state's certification and curriculum requirements even if they were shown to be universally effective in the one instance, and uniform as to every detail in the other. Their First Amendment claim is based on a

complete rejection of state authority, not on the failure or narrowness of application of any particular state policy. Like those in question in *Shaver, supra,* the Michigan standard "may be imperfect, [but] without the regulations the state would have no reasonable assurance that its recognized interest in providing an education for its youth is being protected". 294 NW2d 900.

Indeed, we believe that this interest is not only "recognized" but it is of sufficient urgency to be classified as "compelling" within the constitutional standard that any intrusion upon religious practice can only be justified if there is a "compelling state interest". Plaintiffs have urged that there is no compelling state interest in any of the specific state requirements involved in this case but this argument misplaces the emphasis. The issue is not whether there is a compelling state interest in any individual regulation but whether the individual regulations are reasonable means to give effect to a broader compelling state interest—in this case the provision of an education to all children. For the reasons stated herein, we believe the regulations are a reasonable exercise of state authority in the field of education.

## II

### The Curriculum and Certification Requirements Do Not Violate the First Amendment Establishment Clause Because They Do Not Necessitate Excessive Governmental Entanglement With Religion

The United States Supreme Court has applied a three-part test to determine whether a law violates the Establishment Clause of the First Amendment. "[A] statute must have a secular legislative pur-

pose, must have a principal or primary effect that neither advances nor inhibits religion, *and must not foster an excessive government entanglement with religion." Wolman v Walter,* 433 US 229, 236; 97 S Ct 2593; 53 L Ed 2d 714 (1977). (Citations omitted; emphasis added.) The issue here arises from the trial court's terse conclusion that the teacher certification requirement and curriculum regulations violate the third portion of this test.

The Court stated as follows in *Lemon, supra,* 403 US 615:

"In order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited, the nature of the aid the State provides, and the resulting relationship between the government and the religious authority."[2]

In a concurring opinion in *Walz v Tax Comm,* 397 US 664, 695; 90 S Ct 1409; 25 L Ed 2d 697 (1970), Justice Harlan noted the dangers arising from "government participation in certain programs, whose very nature is apt to entangle the state in details of administration and planning" of religious institutions.

It does not, however, follow that the state must abstain totally from regulatory contact with religious schools. "Some relationship between government and religious organizations is inevitable." *Lemon, supra,* 403 US 614. "The test is inescapably one of degree." *Walz, supra,* 397 US 674. "The State may require that schools that are utilized to

[2] Here we may substitute for this language the following:

In order to determine whether the government entanglement with religion is excessive, we must examine the character and purpose of the institutions that are burdened, the nature of the burden which the state imposes, and the resulting relationship between the government and the religious authority.

fulfill the State's compulsory-education requirement meet certain standards of instruction * * * and may examine both teachers and pupils to ensure that the State's legitimate interest is being fulfilled." *Wolman, supra,* 433 US 240. (Citations omitted.)

Plaintiffs argue that the requirements necessarily imply a substantial state scrutiny and investigation of their schools. To the contrary, the state's curriculum review consists of a mere comparison of the courses offered in the schools to those in the neighboring public schools. Plaintiffs met these requirements with little difficulty. There is no continuous state involvement in the operation of the schools but only "occasional communication between the two entities". *Citizens To Advance Public Education v State Superintendent of Public Instruction,* 65 Mich App 168, 179; 237 NW2d 232 (1975), *lv den* 397 Mich 854 (1976).

In *New Jersey State Bd of Higher Ed, supra,* 90 NJ 400; 488 A2d 988, 997, the New Jersey Supreme Court rejected the argument that state licensure of degree programs in parochial institutions of higher learning violates the First Amendment. "The Establishment Clause permits minor, unobtrusive state supervision of religiously oriented schools." See, also, *Attorney General v Bailey,* 386 Mass 367; 436 NE2d 139 (1982).

Regulation of plaintiffs' schools does not entail "a comprehensive, discriminating, and continuing state surveillance". *Lemon, supra,* 403 US 619. Accordingly, the teacher certification and curriculum requirements involve permissible state contacts with the religious schools.

### III

### The Use of Statistical Data

The trial court ordered that the information

gathered from the schools pursuant to MCL 388.555; MSA 15.1925, "be used for statistical and comparison purposes only". Since the court erred in concluding that the state's regulatory scheme violated the First Amendment, there remains no justification for restricting the state in its use of the information. Therefore, the state may use statistical data gathered from plaintiffs in ˇthe same manner that such data are used vis-à-vis the public schools.

## IV

### THE STATE'S REGULATORY SCHEME IS NOT UNCONSTITUTIONALLY VAGUE

Plaintiffs contend that the curriculum requirements are unconstitutionally vague because they lack specificity as to what courses must be offered. As noted above, the state has largely delegated this task to local school authorities. MCL 380.1282; MSA 15.41282. In order to win state approval for purposes of the compulsory attendance law, a nonpublic school must offer courses "comparable" to those offered by the public schools in the district within which the nonpublic school is located. MCL 380.1561(3)(a); MSA 15.41561(3)(a).

The vagueness doctrine "helps to ensure that individuals are not held responsible by the state for conduct they could not reasonably understand to be proscribed". *State Board of Dentistry v Blumer*, 78 Mich App 679, 683; 261 NW2d 186 (1977). The record reveals no difficulty in ascertaining the course of study in the public school district wherein plaintiffs' schools are located. The state has already determined that plaintiffs' schools meet the requirements. Moreover, given the pub-

lic's interest in local participation in formulation of educational programs, the standards are as reasonably precise as the subject matter permits. *Dep't of Natural Resources v Seaman,* 396 Mich 299, 309; 240 NW2d 206 (1976). Accord, *Bangor Baptist Church v State of Maine,* 549 F Supp 1208, 1227-1228 (D Me, 1982); *Scoma v Chicago Bd of Ed,* 391 F Supp 452, 462-463 (ND Ill, 1974).

In any event, the requirements imposed upon plaintiffs' schools are no more vague than those imposed upon the public schools and, as we have indicated elsewhere herein, plaintiffs' objections are to any curriculum requirements at all. No matter how specific the curriculum requirements might be, plaintiffs would object to being subjected to them.

## V

### The Danger of Future Abuses by the State

Plaintiffs are concerned with the potential for abuses by local school boards but are unable to point to any that have actually occurred. Plaintiffs have the burden of showing an actual infringement of their rights. *Hough, supra.* The statutory scheme should not be invalidated merely because it may be susceptible to an unconstitutional interpretation. *New Jersey State Bd of Higher Ed, supra,* 90 NJ 490.

"[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts." *Erznoznik v City of Jacksonville,* 422 US 205, 216; 95 S Ct 2268; 45 L Ed 2d 125 (1975). "Wherever possible an interpretation that does not create constitutional invalidity is preferred to one that does." *Traverse City School Dist v Attorney General,* 384

Mich 390, 406; 185 NW2d 9 (1971); *Royal Auto Parts v Michigan,* 118 Mich App 284, 289; 324 NW2d 607 (1982). "[I]t is only when manifest assumption of authority and clear incompatibility between the constitution and the law appears, that the judicial power can refuse to excecute it." *People v Collins,* 3 Mich 343, 348 (1854).

If those who have authority to administer the state's education requirements do so in an arbitrary or capricious manner or in a manner which limits plaintiffs' rights to teach their religious doctrines, plaintiffs are free to challenge the propriety of such action. However, the mere existence of the right to impose teacher certification and curriculum requirements is not, in itself, an unconstitutional intrusion upon religious liberty.[3]

### CONCLUSION

The judgment of the Ingham County Circuit Court of January 12, 1983, is reversed except as provided herein. We specifically hold:

I. That the portion of 1921 PA 302, § 1, requiring the courses of study and qualifications of teachers in all private, denominational, or parochial schools to "be of the same standard as provided by the general school laws of the state" is constitutional as applied to the plaintiffs;

II. That 1921 PA 302, § 3, requiring all teachers employed in a private, denominational, or paro-

---

[3] Lest there be any misunderstanding, we are not saying that teacher certification and curriculum requirements are a necessary form of regulation of nonpublic schools. The Legislature might very well choose other means to assure conformity to minimum standards. We are merely saying that the particular form of regulation chosen by the Legislature is constitutionally permissible. Having so ruled, our inquiry can go no further since it is not our function to pass upon the wisdom of legislation once we decide that it conforms to the Constitution.

chial school with secular instructional responsibilities to hold a valid Michigan teacher's certificate is constitutional as applied to the plaintiffs;

III. That the injunction restraining defendants from enforcing, as to plaintiffs, 1921 PA 302, § 3 and that portion of 1921 PA 302, § 1 which the trial court found to be unconstitutional in its opinion of December 29, 1982, is hereby vacated;

IV. That the information gained from plaintiffs under 1921 PA 302, § 5 may be used for the same purposes that such information is used with regard to the public schools and that such information may be used for purposes of approval of the plaintiff schools;

V. That defendants' prayer for injunctive relief requiring the plaintiff churches and schools to submit for examination, through the use of the nonpublic school membership report or by personal examination, the records of enrollment of pupils attending their schools and the qualifications of their teachers teaching at such schools shall be granted.

This case is remanded to the trial court for issuance of an injunctive order consistent with this opinion.

No costs or attorney fees, a public question being involved.