DEPARTMENT OF SOCIAL SERVICES v EMMANUEL BAPTIST PRE-SCHOOL

Docket No. 77946. Submitted August 6, 1985, at Lansing.—Decided April 7, 1986. Leave to appeal applied for.

The Emmanuel Baptist Bible Church operates the Emmanuel Baptist Pre-School. In 1974, the church received a provisional license permitting care of up to 20 children between the ages of two and one half and six years. The school received its regular license in 1976. In 1978, representatives of the Department of Social Services inspected the pre-school and noted certain violations. The church was notified of those violations in 1979, whereupon the church indicated to the DSS that, because of religious principles, the pre-school no longer desired licensure. The license for the pre-school was revoked in 1979, but the church has continued to operate the pre-school. The Department of Social Services brought in Ingham Circuit Court a declaratory judgment action, seeking a declaration that the pre-school was subject to the provisions of the child care organizations act and the rules promulgated pursuant to that act and seeking that the operation of the pre-school be enjoined until a license to operate had been secured. Both Emmanuel Baptist Pre-School and Emmanuel Bible Baptist Church were named as defendants. The church raised as affirmative defenses that the Legislature had improperly delegated licensing authority to the DSS and that various portions of both the child care organizations act and rules promulgated under that act were unconstitutional in that they infringed upon the church's constitutionally protected religious rights. The trial court, Thomas

REFERENCES

Am Jur 2d, Constitutional Law §§ 464 et seq.

Am Jur 2d, Infants § 16

Am Jur 2d, Schools §§ 258, 299 et seq.

Who has custody or control of child within terms of penal statute punishing cruelty or neglect by one having custody or control. 75 ALR3d 933.

Teacher's civil liability for adminstering corporal punishment to pupil. 43 ALR2d 469.

See also the annotations in the ALR3d/4th Quick Index under Day Care Centers or Camps; Religion and Religious Matters.

L. Brown, J., held that the defendants were subject to the provisions of the child care organizations act and the rules promulgated under that act except that the defendants did not have to comply with the rule relating to the educational qualifications of the school's director, nor with the rule relating to the fostering of a positive self-concept, nor with the rule with respect to corporal punishment providing that the use of corporal punishment was reasonable and limited in force and duration, nor with the rule that permitted the DSS to inspect the financial records of the church. Subject to those exceptions, the defendants were enjoined from operating the pre-school without first having obtained the license required by the statute and rules and were enjoined from preventing the DSS from making the investigations necessary for that licensure. The DSS appealed. Defendants cross-appealed. *Held:*

1. The state may properly require the licensure of, and regulate the secular aspects of, a pre-school facility operated by a religious corporation, since, even if such licensure imposes some burden on the exercise of religious beliefs, there is a compelling state interest in the protecting and nurturing of young children such as will render any burden on the exercise of religion constitutionally permissible.

2. The rule requiring that the director of a child care facility shall have a degree from an accredited college or university does not impose a constitutionally impermissible burden upon the practice of religion even though it may have the effect of excluding from such positions persons who have graduated from certain fundamentalist institutions which do not believe in accreditation.

3. The state may properly require that child care facilities promote a positive self-concept in the children at the facility, since any infringement on the excercise of religious beliefs which may result from such a requirement is outweighed by the state's interest in protecting the emotional well-being of the children.

4. The state may properly prohibit corporal punishment by other than open palm of the hand. The interest of the state in protecting the physical well-being of the children outweighs any infringement of religious beliefs that comes from prohibiting compliance with the biblical injunction that to spare the rod spoils the child.

5. Requiring licensure of child care facilities operated by a religious corporation does not violate the establishment of religion clause of the United States Constitution.

6. Neither the child care organizations act nor any of the

rules promulgated pursuant to that act are constitutionally vague.

Affirmed in part, reversed in part.

1. CONSTITUTIONAL LAW — RELIGION — PRACTICE OF RELIGION.

There is an unqualified prohibition against governmental interference with religious beliefs; however, governmental regulations may lawfully impose incidental burdens on otherwise protected religious conduct.

2. CONSTITUTIONAL LAW — RELIGION — PRACTICE OF RELIGION.

The determination of whether a government regulation impermissibly infringes on the practice of one's religious beliefs or principles involves three considerations: first, whether the belief, or conduct motivated by the belief, is religious in nature; second, whether the regulation under review imposes a substantial burden on the exercise of religion; and, third, if the complaining party has demonstrated that the regulation imposes a burden on the practice of religion, whether there is some compelling state interest which justifies the burden placed upon the practice of religion; relevant to the third prong of the test is an inquiry as to whether there exists a less restrictive alternative to the regulation.

3. CONSTITUTIONAL LAW — RELIGION — PRACTICE OF RELIGION.

A claim that a governmental licensure or regulation scheme impermissibly infringes on the free exercise of religion can succeed only where the rule or statute suppresses the exercise of sincere religious beliefs or the dissemination of religious views, as opposed to the regulation of the manner in which secular activities are conducted.

4. CONSTITUTIONAL LAW — RELIGION — PRACTICE OF RELIGION.

The freedom to hold a religious belief is absolute, the freedom to act is not.

5. CONSTITUTIONAL LAW — RELIGION — PRACTICE OF RELIGION — CHILD CARE FACILITIES — LICENSES.

The state may properly require the licensure of, and regulate the secular aspects of, the operation of a child care facility operated by a religious corporation since, even if such regulation imposes some burden on the exercise of religious beliefs, there is a compelling state interest in protecting and nurturing young children such as will render any resulting burden on the exercise of religion constitutionally permissible (MCL 722.111 et seq.; MSA 25.358[11] et seq.).

6. SOCIAL SERVICES — CHILD CARE FACILITIES — CONSTITUTIONAL LAW — PRACTICE OF RELIGION.

The Department of Social Services regulation requiring that the director of a child care facility have a degree from an accredited college or university does not impose a constitutionally impermissible burden upon the practice of religion by a religious corporation operating a child care facility since, to the extent that such a requirement may exclude persons holding degrees from unaccredited colleges or universities which promote particular religious beliefs and thereby burden the free exercise of religion, that burden is insignificant compared to the state's compelling interest in insuring the quality of education and in protecting the safety and welfare of pre-school age children (1980 AACS, R 400.5104[2]).

7. SOCIAL SERVICES — CHILD CARE FACILITIES — CONSTITUTIONAL LAW — PRACTICE OF RELIGION.

The state, as part of its regulation of child care facilities, may properly require a religious corporation which operates such a facility to promote among the children at the facility a positive self-concept since, to the extent such a requirement may infringe upon the exercise of religious beliefs, the requirement is a rational means to serve the state's interest in protecting the children's emotional well-being (1980 AACS, R 400.5106[1][c]).

8. SOCIAL SERVICES — CHILD CARE FACILITIES — CORPORAL PUNISHMENT — CONSTITUTIONAL LAW — PRACTICE OF RELIGION.

The state, in its regulation of child care facilities, may enforce a prohibition of any corporal punishment except when done by the open palm of the hand against a religious corporation which operates a child care facility but believes, on religious grounds, that corporal punishment should be with a rod, since the interest of the state in protecting the physical well-being of the children justifies the minor infringement of religious beliefs which results from the application of the prohibition on the use of anything other than the hand to administer corporal punishment (1980 AACS, R 400.5107).

9. CONSTITUTIONAL LAW — RELIGION — PRACTICE OF RELIGION — ESTABLISHMENT CLAUSE.

A statute is not violative of the establishment clause of the United States Constitution where the law in question: (1) reflects a clearly secular purpose, (2) has a primary effect that neither advances nor inhibits religion, and (3) avoids excessive government entanglement with religion (US Const, Am 1).

10. Constitutional Law — Religion — Practice of Religion —
    Social Services — Child Care Facilities.
    The child care organizations act and the child care facilities
    licensure rules adopted pursuant to that act are not unconstitu-
    tionally vague (MCL 722.111 *et seq.;* MSA 25.358[11]; 1980
    AACS, R 400.5101 *et seq.).*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Christopher D. Dobyns,* Assistant Attorney General, for plaintiff.

*Lee Boothby,* for defendant.

Before: Hood, P.J., and D. E. Holbrook, Jr. and D. P. Kerwin,* JJ.

D. P. Kerwin, J. On April 11, 1984, the circuit court entered an order enjoining defendant Emmanuel Baptist Bible Church from operating the defendant Emmanuel Baptist Pre-School without a license, and declaring the pre-school exempt on First Amendment grounds from complying with certain Department of Social Services licensing requirements if and when it seeks licensure. Plaintiff DSS appeals as of right from that portion of the order holding the pre-school partially exempt from compliance. Defendants cross-appeal from that portion of the order enjoining them from operating an unlicensed child care center. We affirm the order requiring licensure, but reverse that part of the order finding exemptions.

I. Background

Defendant Emmanuel Baptist Bible Church is a fundamentalist Baptist church which operates the Emmanuel Baptist Pre-School. In 1974, the church received a provisional license permitting care of

* Circuit judge, sitting on the Court of Appeals by assignment.

up to 20 children, ages 2½ to 6 years. Two more provisional licenses were issued in 1975, and the pre-school received regular licensure in 1976. DSS representatives inspected the pre-school in 1978 and noted rule violations of which the church was informed in 1979. Pastor Harold Asire and Mark Asire, the pre-school's principal, informed DSS representatives in May, 1979, that the pre-school no longer desired licensure because of religious principles. The pre-school was delicensed in June, 1979. Notwithstanding, the church continued to operate the pre-school in violation of 1973 PA 116, § 5(1); MCL 722.115(1); MSA 25.358(15)(1).

DSS sought a declaratory judgment holding that the pre-school was subject to the licensing requirements of the child care organizations act, as amended, MCL 722.111 *et seq.;* MSA 25.358(11) *et seq.,* (the act), and sought to enjoin unlicensed operation of the pre-school. The church alleged as affirmative defenses that the Legislature had improperly delegated licensing authority to the DSS, that the child care organizations act was unconstitutional under the First Amendment as applied to the church and created an excessive entanglement between church and state, and that certain pending administrative rules under the act would infringe upon defendant church's First Amendment rights. The lower court, after hearing the evidence, ruled that the church should be required to obtain a license to operate its pre-school, but that neither the DSS administrative rules regulating staff qualifications, program and discipline nor the statute regarding inspection of financial records should be utilized if the church sought licensure. The order provided:

"* * * Defendants are bound by the requirements of the child care organization act, 1973 PA 116, as

amended; MCL 722.111 *et seq.;* MSA 25.258(11) *et seq.,* and the administrative rules promulgated thereunder, pertaining to the licensing of child care centers, subject to the following exceptions:

"1. Defendants should not be required to comply with 1980 AACS R 400.5104(2)(a)(b) & (3) [regarding program director qualifications];

"2. Defendants should not be required to comply with 1980 AACS R 400.5106(1)(c) [regarding fostering positive self-concept];

"3. Defendants should not be required to comply with 1980 AACS R 400.5107(2) to the extent that said rule prohibits the use of corporal punishment, provided Defendants' use of corporal punishment at the Emmanuel Baptist Pre-School be reasonable under the circumstances and limited in force and duration;

"4. Sections 2(3)(c) and 5(1) of 1973 PA 116; MCL 722.112(3)(c) and 722.115(1); MSA 25.358(12)(3)(c) and 25.358(15)(1) should not be strictly enforced against Defendant Emmanuel Baptist Bible Church to the extent that said statutory provisions allow Plaintiff to inspect the financial records of Defendant Church;

"IT IS FURTHER ORDERED that subject to the hereinabove enumerated exceptions, Defendants Emmanuel Baptist Bible Church and Emmanuel Baptist Pre-School * * * are hereby enjoined:

"1. From operating an unlicensed child care center in violation of 1973 PA 116, sec 5(1); MSA 722.115(1); MSA 25.358(15)(1);

"2. From preventing the Michigan Department of Social Services from investigating and inspecting the operation of the Emmanuel Baptist Pre-School as a child care center for purposes of determining whether the Emmanuel Baptist Pre-School meets minimum licensing standards and determining whether the health, safety and well-being of the children attending the Emmanuel Baptist Pre-School are being protected."

DSS now appeals from the four exceptions to application of the administrative rules which were carved out by the lower court. The church cross-appeals, presenting a challange to the entire issue of licensure.

## II. The Act and the Rules

The child care organizations act protects children through the licensing and regulation of child care organizations and provides for establishment of standards for child care organizations. Under the act, an entity, such as the church, wishing to operate a child care center must apply for a license. Subsection 2(1) authorizes the DSS to develop rules for the care and protection of children in covered organizations. MCL 722.112(1); MSA 28.358(12)(1). The rules set minimum standards for child care. MCL 722.112(3); MSA 25.358(12)(3).

Prior to June 4, 1980, administrative rules governing child care organizations were those promulgated effective June 14, 1957. See 1979 AC, R 400.120 *et seq.* Pursuant to subsection 2(1) of the act, DSS promulgated new rules regarding child care licensing, including provisions regarding care of children ages 2½ to 5 years, in 1980 AACS, R 400.5101 *et seq.,* effective June 4, 1980, one year after the church relinquished its license for the pre-school.[1] Under Rule 118, applicants or licensees may request an exemption from the administrative rule if there is clear and convincing evidence that they have an alternative which complies with the intent of the rule. 1980 AACS, R 400.5118.

## III. Free Exercise of Religion

The church complained in the lower court that the administrative rules and general licensing

---

[1] The rules relate to the daily care of children. For example, the program director must be present a certain number of hours each day, 1980 AACS, R 400.5103. Centers are required to provide children with a daily program of activities. 1980 AACS, R 400.5106. Standards for furniture, play and sleeping equipment are listed, as are nutritional standards. See 1980 AACS, R 400.5108, 400.5109, 400.5110.

requirements burdened its exercise of religion and constituted excessive entanglement with its affairs. We undertake our review in light of these complaints, which have been reasserted on appeal.

The First Amendment's free exercise clause provides that Congress shall make no law "prohibiting the free exercise" of religion.[2] US Const, Am I. While there is an unqualified prohibition against governmental interference with religious beliefs, governmental regulation may lawfully impose an incidental burden on otherwise protected religious conduct. See *Wisconsin v Yoder,* 406 US 205, 220; 92 S Ct 1526; 32 L Ed 2d 15 (1972); *Sherbert v Verner,* 374 US 398, 403; 83 S Ct 1790; 10 L Ed 2d 965 (1963); *Cantwell v Connecticut,* 310 US 296, 303-304; 60 S Ct 900; 84 L Ed 1213 (1940).

A balancing test is employed to determine whether government may regulate conduct prompted by religious belief or principle. *Yoder, supra,* 406 US 221; *Sherbert, supra,* 374 US 403, 406. First, the belief, or conduct motivated by the belief, must be religious in nature. Second, the party complaining of a free exercise clause violation must show that the regulations under review impose a substantial burden on the exercise of religion. Third, if the complaining party demonstrates that it is burdened by the regulations, the state must have a compelling state purpose for its laws. Relevant to this prong is an inquiry into whether there exists a less restrictive alternative to the regulation. *Sherbert, supra,* 374 US 403-407. See, also, *Sheridan Road Baptist Church v Dep't of Education,* 132 Mich App 1; 348 NW2d 263 (1984), *lv den* 419 Mich 916 (1984), *reconsideration granted* 422 Mich 857 (1985).

[2] The free exercise clause was applied to the states in *Gitlow v New York,* 268 US 652; 45 S Ct 625; 69 L Ed 1138 (1925).

## A. *Licensure Does Not Burden the Church's Free Exercise of Religion*

In the lower court and again on appeal the church asserted that the pre-school is part of its ministry which may be governed by God but not by the state. The lower court held that the burden licensure imposes on the church's free exercise rights was outweighed by the state's interest in protecting children. We affirm this ruling.

Indirect financial or regulatory burdens do not necessarily infringe upon the free exercise of religion. *Braunfeld v Brown,* 366 US 599, 606; 81 S Ct 1144; 6 L Ed 2d 563 (1961). In the licensure and regulation context, a free exercise claim can succeed only where the rule or statute suppresses the exercise of sincere religious beliefs or the dissemination of religious views, as opposed to regulating the manner in which secular activities are conducted. *Murdock v Pennsylvania,* 319 US 105; 63 S Ct 870; 87 L Ed 1292 (1943); *Follett v Town of McCormick,* 321 US 573; 64 S Ct 717; 88 L Ed 938 (1944); *Cox v New Hampshire,* 312 US 569; 61 S Ct 762; 85 L Ed 1049 (1941). Under this test, the free exercise clause has not prevented licensure or regulation of facilities such as day care centers. See, *e.g., Roloff Evangelistic Enterprises, Inc v Texas,* 556 SW2d 856 (Tex Civ App, 1977), *app dismissed* 439 US 803; 99 S Ct 58; 58 L Ed 2d 96, *reh den* 439 US 998; 99 S Ct 601; 58 L Ed 2d 672 (1977).[3]

In the present case, we have no problem with the first and second prongs of the *Sherbert* test.

[3] Accord, *North Carolina v Fayetteville Street Christian School,* 42 NC App 665; 258 SE2d 459 (1979), *vacated and remanded on other grounds* 299 NC 351; 261 SE2d 908 (1980); *Kansas ex rel O'Sullivan v Heart Ministries, Inc,* 227 Kan 244; 607 P2d 1102 (1980); *Kansas ex rel Pringle v Heritage Baptist Temple, Inc,* 236 Kan 544; 693 P2d 1163 (1985); *Texas v Corpus Christi People's Baptist Church, Inc,* 683 SW2d 692 (Tex, 1984).

This claim is undoubtedly rooted in the church's fundamentalist Christian doctrine. Moreover, regulation poses some burden on the free exercise of religion, but not necessarily the burden as described by the church.

The church assails licensure on the general principle that the state has no right to govern the operations of its educational ministry. While we recognize the freedom to hold religious belief is absolute, the freedom to act is not. *Cantwell v Connecticut, supra.* The act's licensing scheme does not regulate the content of the church's fundamentalist teachings. Rather, it regulates the pre-school's secular activities as a pre-school—*i.e.,* the physical care of 2½ to 5 year olds in attendance there.[4] While the church has shown that it abhors licensure as a general proposition, it has presented no evidence that the DSS has ever attempted to regulate the religious program or suppress the exercise of religious beliefs at the pre-school.

Even had a specific burden been demonstrated, we are of the opinion that the state's compelling interest in protecting and nurturing its very young children, *Prince v Massachusetts,* 321 US 158; 64 S Ct 438; 88 L Ed 645 (1944), and in licensing and regulating day-care facilities for minor,[5] renders any burden on the church's exercise of religion a constitutionally permissible one.

For the foregoing reasons, we affirm that portion of the trial court's order enjoining the church from operating an unlicensed day-care center.

*B. Rule 104(2) Burdens the Church's Free Exercise of Religion But the Burden is Constitutionally Permissible*

The church claimed in the lower court that 1980

---

[4] See footnote 1, *supra.*

[5] See cases cited in footnote 3, *supra.*

AACS, R 400.5104(2), which specifies educational qualifications for the program director of a child care organization, unlawfully burdens the free exercise of its religious beliefs. The rule provides, in pertinent part:

"(2) With respect to the qualifications for program director, a center shall comply with either of the following subdivisions:

"(a) A program director shall have completed a minimum of 60 semester hours of credit at an accredited college or university and shall have completed not less than 12 semester hours in child development, child psychology, or early childhood education. * * *

"(b) A program director shall have been awarded the child development associate credential by the child development associate consortium and shall have completed not less than 12 semester hours in child development, child psychology, or early childhood education at an accredited college or university. * * *

"(3) A Center shall keep on file verification of the education qualifications of the program director and the credential qualifications, as applicable."

The church selects its pre-school director and teaching staff from fundamentalist Christian colleges such as Bob Jones University and Tennessee Temple University, which shun accreditation on Biblical grounds. Persons who have attended accredited schools are acceptable if they are born-again Christians. The lower court held that Rule 104 usurps the church's prerogative to select staff for its ministerial program and prevents the church from selecting a director from a college which holds beliefs compatible with its own. DSS challenges this ruling. We reverse, as we find that the rule poses a constitutionally insignificant burden on the church's free exercise of religion.

Rule 104 guards against the risks of operating a

child care center under the guidance of an unqualified individual. As applied to the church, the rule regulates who may or may not head a child care center based upon their decision to attend an accredited college or university or a non-accredited fundamentalist school.[6] In this manner it burdens the church's free exercise of religion. However, the lower court record does not support a finding that Rule 104 as applied imposes a significant burden on defendants' free exercise of religion. There was evidence that DSS has developed certain steps to determine whether a college or university is "accredited" for the purposes of enforcing 1980 AACS, R 400.5104. Under the policy, the many in-state and out-of-state colleges which accept credits from institutions such as Bob Jones University and Tennessee Temple University provide a means for "accreditation" for those schools. Moreover, under Rule 118, 1980 AACS, R 400.5118, a licensed applicant may be exempted from any administrative rule if there is clear and convincing evidence that an alternative complies with the intent of the administrative rule. These rules, if used by the church, provide a method of avoiding the burdens posed by Rule 104. As the church has two ways to avoid the burden imposed by Rule 104, we do not see the church's claims as constitutionally significant.

Moreover, the state's compelling interest in assuring that program directors posses minimal qualifications is of sufficient magnitude to override any burden imposed upon the church in finding teachers from "accredited" institutions. The care and protection of children is a matter of "paramount importance" to the state. *Fisher v Fisher,*

[6] The pre-school's goal is to provide religious education as part of its ministry. Children are given Bible instruction with the remainder of time devoted to integrating Biblical principles with the rest of the program.

118 Mich App 227, 232-233; 324 NW2d 582 (1982), *lv den* 414 Mich 919 (1982); *Prince v Massachusetts, supra.* There was testimony in the lower court that setting minimum educational standards for program directors in child care centers is a necessary means of protecting the state's interest in the safety and welfare of pre-school age children. There was also evidence that program quality increases where the program director has more training and that the quality of a child care center hinges directly on the quality of its director.

This Court recognized in *Sheridan Road Baptist Church, supra,* that the state has an interest in the quality of education, but that the state's interest must be balanced against the free exercise rights of others. The issue is whether the regulations reasonably effectuate the broader compelling state interest of providing education to all children. 132 Mich App 22. We believe Rule 104 is an eminently reasonable means to foster the state's interest in providing young children with quality pre-school programs.

### C. Rule 106 Does Not Burden the Church's Free Exercise Rights

1980 AACS, R 400.5106(1)(c) requires child care centers to provide a program which fosters a "positive self-concept" among children:

"Rule 106. (1) A center shall provide a program of daily activities and relationships that offers opportunities for the development growth of each child in the following areas:

\* \* \*

"(c) Emotional development, *including positive self—concept."* (Emphasis added.)

The church claims this rule unlawfully burdens

the free exercise of its religious beliefs. The church teaches children the doctrine of innate depravity of mankind, which holds that all human beings are sinners in need of salvation. In the lower court, the church expressed concern that a DSS inspector might misinterpret the teaching of this doctrine as being contrary to Rule 106(1)(c), and deny or revoke licensure on that basis. The church also assails the rule as promoting "secular humanism", as opposed to fundamentalist doctrine. The lower court held that the church did not have to comply with Rule 106 because the rule espouses humanistic values which directly conflict with the church's fundamentalist beliefs.

However, at trial it was established that the church does *not* oppose a child's having a positive self-concept, so long as it is within its religious framework. The church's apparent concern was that non-fundamentalists would not be able to understand that a fundamentalist Christian could have a positive self-concept and also be aware of his depraved condition as a human being. The DSS and the church, it is feared, might clash on this issue time and again in the future. A DSS representative testified that the doctrinal position that each individual is depraved would not contradict the "positive self-concept" rule. The rule, the representative indicated, speaks to the way children are handled, *i.e.,* whether they are belittled or demeaned by adults, or made to feel inferior to other children. DSS did not oppose the teaching of doctrine so long as it is age-appropriate. There was also testimony that almost any reasonable program would stand the test of this rule. Under it, a day care center may adopt the methodology of its choice.

The church evidences great concern about the *potential* for abuse in the "positive self-concept"

rule, but fails to show any actual infringement which has burdened its free exercise of religion. We will not invalidate a statutory scheme merely because it may be subject to an unconstitutional interpretation. *Sheridan Road Baptist Church, supra,* pp 26-27. Here, we have no specific instance of the state's intrusion upon the church's religious doctrinal freedom through imposition of the "positive self-concept" rule.[7] We therefore hold that Rule 106(1)(c) is a rational means to serve the state's interest in protecting a child's emotional well-being while at a day care facility, and that the church must be required to abide by it.

### D. Rule 107(2) Burdens the Church's Free Exercise of Religion But the Burden is Outweighed by the State's Interest in Protecting Children

1980 AACS, R 400.5107 prohibits corporal punishment by a child care center staff member:

"(2) Staff shall be prohibited from using the following as a means of punishment:

"(a) Hitting, shaking , biting, pinching, or inflicting a form of corporal punishment.

"(b) Restricting a child's movement by binding or tieing him or her.

"(c) Inflicting mental or emotional punishment, such as humiliating, shaming, or threatening a child.

"(d) Depriving a child of meals, snacks, rest, or necessary toilet use.

"(e) Confining a child in an enclosed area, such as a closet, locked room, box, or similar cubicle."

On May 19, 1980, the DSS issued an interpretative guideline which permits the use of spanking a

---

[7] Even had we found Rule 106 to burden the church's free exercise of religion, the state's compelling interest in protecting the emotional well-being of pre-school-age children who receive out-of-home care overrides any minimal intrusion on defendants' free exercise of religion.

child care centers under specific circumstances. Instructional Memorandum No. 80-09, which was introduced at trial, provides in pertinent part:

"The interpretation, outlined below, should not be construed to mean that the Department encourages spanking. In fact, technical assistance should be provided to enable licensees to comply by other methods which are clearly preferred.

"Interpretation outline: If spanking is to be used, as a form of discipline, it is to be in accordance with subrule (4) of new Administrative Rule 5107—Discipline, and in accordance with the following:

"(a) A child is not to be spanked on any part of his or her body, except the buttocks.

"(b) The buttocks are to be protected with the child's clothing.

"(c) Only the program director of a caregiver is to spank a child.

"(d) *No instrument is to be used to spank a child, except the open palm of the program director's or caregiver's hand.*

"(e) The spanking is to be brief in duration and reasonably light in force." (Emphasis added.)

The church adheres to a literal interpretation of the Biblical admonition: "Spare the rod, spoil the child". At the pre-school, teachers spank children using a ping pong paddle, as it is believed that the Biblical injunction requires the use of a "rod" as opposed to the hand. The church asserted in the lower court that Rule 107 unlawfully burdens the free exercise of its religious beliefs. The lower court agreed with the church, ordering that the church need not comply with the rule to the extent that it prohibits the use of corporal punishment, so long as punishment at the pre-school was reasonable under the circumstances and limited in force and duration. In our view, the lower court erred in ruling that the church need not refrain

from corporal punishment using a ping pong paddle. Additionally, the lower court failed to balance the state's interest in enforcing the corporal punishment rule against the burden to the church.

The state's interest is clear and compelling. The rule protects very young children from physical harm by prohibiting potentially abusive forms of discipline. Child abuse by adults is a major risk to children receiving daily out-of-home care in day-care centers. Children in age ranges 2½ to 6 are not likely to protest abusive punishment. Thus, although the prohibition against spanking with a ping pong paddle burdens the church's free exercise of its religious beliefs, the state's interest in protecting its very young outweighs the burden. In so holding, we recognize that some practices rooted in religious principle may be dangerous to the health and welfare of certain members of society. See *Kansas ex rel Pringle v Heritage Baptist Temple, Inc,* 236 Kan 544, 549-550; 693 P2d 1163 (1985). It is not beyond the power of government to prevent such practices through regulation.

*E. MCL 722.112(3)(c); MSA 25.358(12)(3)(c) and MCL 722.115(1); MSA 25.358(15)(1) Do Not Burden the Church's Free Exercise of Its Religious Beliefs*

The church claimed in the court below that both MCL 722.112(3)(c); MSA 25.358(12)(3)(c) and MCL 722.115(1); MSA 25.358(15)(1), which authorize the DSS to inspect the financial records of child care organizations, place an unlawful burden on the exercise of its religious beliefs. The two subsections provide:

"(3) The rules promulgated under this act shall be restricted to:

* * *

"(c) The *general financial ability* and competence of

applicants to provide necessary care for children and to maintain prescribed standards." (Emphasis added.) MCL 722.112(3)(c); MSA 25.358(12)(3)(c).

"Sec. 5. (1) A person, partnership, firm, corporation, association, or nongovernmental organization shall not establish or maintain a child care organization unless licensed or registered by the department. Application for a license or certificate of registration shall be made on forms provided, and in the manner prescribed, by the department. Before issuing or renewing a license, the department shall investigate the activities and proposed standards of care of the applicant and shall make an on-site visit of the proposed or established organization. If the department is satisfied as to the need for a child care organization, *its financial stability,* the good moral character of the applicant, and that the services and facilities are conducive to the welfare of the children, the license shall be issued or renewed." (Emphasis added.) MCL 722.115(1); MSA 25.358(15)(1).

The trial court held that these sections should not be strictly enforced against the church to the extent that they allow plaintiff to inspect the church's financial records. We do not find evidence in the record to support the notion that §§ 2(3)(c) and 5(1) of 1973 PA 116, as applied to the church, burden its free exercise of religion. The church asserts that "the above-cited provisions, without question, present the potential of government intrusion into church affairs" and "they are vague and standardless provisions".

In August, 1974, Pastor Harold Asire completed DSS's then-existing financial form DSS-3603 as part of his application for a license to operate the pre-school. Pastor Asire did not testify as to how complying with this requirement infringed upon the pre-school's free exercise of religion. The use of form DSS-3603 and the requirement for applicants to submit a financial statement was discontinued by a policy memorandum issued in September,

1974. A DSS representative also testified that DSS does not investigate the financial records of child care organizations during initial or periodic on-site investigations. In light of this evidence, we find it difficult to determine how §§ 2(3)(c) and 5(1) as applied have ever burdened the church's free exercise of religion. The church seems to be voicing a general objection to governmental intrusion into church affairs through licensing.

We reverse the holding of the lower court that these sections, to the extent that they allow plaintiff to inspect the church's financial records, should not be strictly enforced against the church.

### F. The Establishment Clause

The church argues that the licensing scheme in the act violates the establishment clause because it creates an "excessive entanglement" between church and state. On appeal, DSS challenges the lower court's holding that the administrative rule regarding the qualifications of a program director violates the establishment clause.

The establishment clause provides: "Congress shall make no law respecting an establishment of religion * * *."[8] US Const, Am I. The United States Supreme Court has fashioned a three-part inquiry for determining whether governmental action violates the establishment clause: (1) the law in question must reflect a clearly secular purpose, (2) the law must have a primary effect that neither advances nor inhibits religion, (3) the law must avoid excessive government entanglement with religion. *Committee for Public Education & Religious Liberty v Nyquist*, 413 US 756, 772-773; 93 S Ct 2955; 37 L Ed 2d 948 (1973),

[8] The establishment clause was applied to the states in *Everson v Board of Education*, 330 US 1, 15-16; 67 S Ct 504; 91 L Ed 711 (1947), *reh den* 330 US 855; 67 S Ct 962; 91 L Ed 1297 (1947).

adopted in Michigan in *Citizens to Advance Public Education v State Superintendent of Public Instruction,* 65 Mich App 168; 237 NW2d 232 (1975), *lv den* 397 Mich 854 (1976). The establishment clause protects against state "censorship, financial support and active involvement" in religious activity. *Walz v Tax Comm,* 397 US 664, 668; 90 S Ct 1409; 25 L Ed 2d 697 (1970).

The issue of whether any part of the child care licensure scheme violates the First Amendment is not an establishment clause issue at all. Establishment clause cases refer to allegations of aid to or sponsorship of religion, either through the granting of public aid to religious schools, *Citizens to Advance Public Education, supra,* the granting of tax-exempt status to religious organizations, *Walz, supra,* or the allowing of religious practices such as prayer to take place in public locations, *Wallace v Jaffree,* 472 US —; 105 S Ct 2479; 86 L Ed 2d 29 (1985). The mandates of the licensure scheme have nothing to do with the establishment of a religion. As licensure of day-care centers is within the area of permissible state involvement with religious institutions, we think that the trial court erred in concluding the 1980 AACS, R 400.5104(2), establishing educational requirements of program directors, constitutes excessive governmental entanglement with church affairs. Moreover, application of the rule does not require continuous state involvement in the operation of the pre-school, but only requires "occasional communication between the two entities".

## V. Vagueness

We reject the church's last claim that the licensing rules are unconstitutionally vague, subjective and ambiguous. We think the rules are as precise as the subject matter permits. *Sheridan Road Bap-*

*tist Church, supra,* pp 25-26. Even if the "positive self-concept" rule were more narrowly and precisely drawn by specifying the program content and the methods of carrying out that program content, objections identical to those raised in this case would undoubtedly have been raised.

Defendants also claim that the Legislature unconstitutionally delegated its legislative power because it failed to articulate standards in conferring authority upon the DSS to promulgate rules under § 2 of the act. The Michigan Constitution provides for separation of powers of the legislative, executive, and judicial branches of government, and thus prohibits exercise of the powers of one branch by another except where expressly permitted by the constitution. Const 1963, art 3, § 2. We think § 2 of the act provides sufficient standards for promulgation of rules by the department, and therefore contains standards "as reasonably precise as the subject matter requires or permits", so that the separation of powers doctrine is not violated. *Osius v St Clair Shores,* 344 Mich 693, 698; 75 NW2d (1956); *Westervelt v Natural Resources Comm,* 402 Mich 412, 434; 263 NW2d 564 (1978).

## VI. CONCLUSION

The lower court was correct in one respect and in error in several others. First, the lower court's decision to require the church to operate a licensed pre-school was correct. However, we find the four exemptions to the licensing requirements carved by the lower court were erroneous and reverse the lower court on all four. Moreover, we do not find that any action by DSS violated the establishment clause in this case, nor do we find any merit in the church's claim that the licensing rules are unconstitutionally vague.

Affirmed in part; reversed in part.