814 P.2d 130

HEALTH SERVICES DIVISION, HEALTH AND ENVIRONMENT DE- PARTMENT OF the STATE OF NEW MEXICO, Plaintiff–Appellee,

v.

TEMPLE BAPTIST CHURCH, Bill Whitehead, Pastor, Charles Shaw, Prin- cipal, and Temple Christian School, De- fendants–Appellants.

No. 10536.

Court of Appeals of New Mexico.

May 7, 1991.

Certiorari Denied June 20, 1991.

Jerry Dickinson, Sp. Asst. Atty. Gen., Health & Environment Dept., Santa Fe, for plaintiff-appellee.

Charles E. Craze, Robin S. Hom, and Zachary S. Gray, Gibbs & Craze Co., L.P.A., Cleveland, Ohio, and Sumner S. Koch, White, Koch, Kelly & McCarthy, P.A., Santa Fe, for defendants-appellants.

## OPINION

CHAVEZ, Judge.

Temple Baptist Church, its pastor, child care center, and the center's principal ("the church") appeal a district court's order granting judgment to the Health Services Division of the Health and Environment Department ("the division"). The judgment enjoined the church from operating its child care center without a license. The church claims the division's rules infringe on free exercise of religion by prohibiting the church from spanking its pupils. *See* New Mexico Regulations Governing Facilities Providing Day/Night Care to Children § 501(G)(1) (1987). The church claims that the statutory requirement of obtaining a license to operate a child care center also violates its right to freely exercise religion. *See* NMSA 1978, § 24–1–5(A) (Repl.Pamp. 1986). We affirm.

## BACKGROUND

The parties agree on the following facts. The church runs a child care center. No children who attend the center stay overnight. It offers a curriculum to the children, which includes religious matters. It has a policy, which the church believes is mandated by the Bible, by which the teachers spank the children when they misbehave. While the church characterizes this as corporal discipline, the division characterizes it as corporal punishment. The practical effect of this policy has been the spanking of three boys throughout the history of the child care center. Absent this policy sanctioning spanking, the church's child care center meets or exceeds all standards the division requires of child care

centers generally. The church operated under a license from 1974 to 1979.

In 1980, the church's pastor concluded that acquiescing to the need for a license was tantamount to subordinating allegiance to Jesus Christ to allegiance to the secular state. He returned the license to the division. After reaching an impasse in negotiations with the church, the division filed suit in 1981. The division sought an injunction against the church's further operation of a child care center without a license.

## DISCUSSION

The first amendment states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * * *" U.S. Const. amend. I. It applies to the division's actions here by virtue of the fourteenth amendment due process clause. *See* U.S. Const. amend. XIV; *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). At trial, the parties based their arguments on *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (*Sherbert*). However, while this appeal was pending, the United States Supreme Court decided *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("*Smith II*"). Supplemental briefing was ordered after that decision was announced. We conclude *Smith II* controls this appeal.

1. *The Free Exercise Clause From Sherbert to Smith II*

To track the changes in the free exercise clause of the first amendment, we first note *Sherbert v. Verner* in which a Seventh–Day Adventist quit her employment rather than work a new schedule which included her Sabbath day. The state unemployment compensation agency denied the worker's compensation claim, finding she had quit without good cause. In reversing, the Court held that the agency had burdened the worker's right to freely exercise her religious beliefs. The Court's operative premise was that the agency was pe-

nalizing her by requiring her to compromise either her right to important government benefits or her sincerely held religious beliefs. The agency was thus burdening her right to freely exercise her religious beliefs. *Id.* The Court then went on to hold that spurious claims and consequent dilution of funds were legitimate government concerns. These concerns might have legitimized the agency's burden on the worker's free exercise right. However, the agency failed to prove the likelihood that these problems would occur if it allowed workers to receive compensation even though they quit for religious reasons. Moreover, the agency failed to prove that it undertook the least restrictive means to protect its legitimate interests. *Id.*

■ A structured free exercise clause analysis arose out of *Sherbert.* First, the party claiming the free exercise right must prove a sincerely held religious belief. Second, that party must prove that state action burdens the exercise of that belief. Third, upon proof of these first two elements, the state must demonstrate a compelling interest which the action serves in the least restrictive manner. *See Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *State ex rel. Pringle v. Heritage Baptist Temple, Inc.,* 236 Kan. 544, 693 P.2d 1163 (1985); *Department of Social Servs. v. Emmanuel Baptist Pre-School,* 150 Mich.App. 254, 388 N.W.2d 326 (1986).

The Supreme Court has found the task of parsing out which beliefs are and which are not central to a faith is " 'not within the judicial ken.' " *See Smith II,* 494 U.S. at 494 U.S. 872, 110 S.Ct. at 1604, 108 L.Ed.2d at 891 (collecting cases) (quoting *Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 700, 109 S.Ct. 2136, 2149, 104 L.Ed.2d 766, 786 (1989)); *but see United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965); *Quaring v. Peterson,* 728 F.2d 1121 (8th Cir.1984), *aff'd by an equally divided court sub nom. Jensen v. Quaring,* 472 U.S. 478, 105 S.Ct. 3492, 86 L.Ed.2d 383 (1985) (whether belief is religious and sincerely held is determined in part by reference to scripture, tradition, and the belief's role in daily life). The Court has also found the process of balancing the individual's civil liberties against the state's interests and choosing a victor to be "a particularly delicate task." *Braunfeld v. Brown,* 366 U.S. 599, 605, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563 (1961). As a consequence of these inherent difficulties, the Supreme Court has, over time, changed its approach to free exercise claims.

The first case to signal this change is *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), in which an Amish merchant opposed paying social security taxes. His reason was that he and his workers did not want to receive benefits upon retirement. The merchant argued the Amish should not have to pay into a fund from which they would never receive a return. The government's rejoinder was that Lee's sincerely held religious belief was independent from government assistance. The requirement that he *pay* money to the government did not burden his belief that he should not *receive* benefits. However, this argument did not persuade the Court. It could not determine whether the payment of taxes threatened the integrity of Lee's religious beliefs because such questions are not susceptible to judicial understanding. However, the Court accepted the government's argument that an exception for Lee would lead to exceptions for other taxes which conflicted with a person's beliefs. Since compulsory participation in tax schemes is vital to the government, the Court would not allow an exception here. The government's compelling interest outweighed Lee's free exercise right. *Id.*

In *Lee,* the Court's inability to determine the exact nature of religious beliefs worked in the individual's favor. In other words, the Court appears to have assumed that Lee sincerely held a broad enough religious belief that the government's actions burdened the belief. However, the Court also assumed that making room for that belief would disrupt government. The practical effect of this analysis was to focus the inquiry on the final balance of state inter-

ests and individual liberty, with the state's interest in uniform applicability being of utmost importance.

We see this approach in use in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988), in which Native Americans sought to enjoin a United States forest service road through sacred areas. Writing for the Court, Justice O'Connor stated:

> However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires. A broad range of government activities—from social welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs. Others will find the very same activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion. The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion. The Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours. That task, to the extent that it is feasible, is for the legislatures and other institutions.

*Id.* at 452, 108 S.Ct. at 1327. The Court conceded that the road as proposed might well lead to the dissolution of the very foundation of the Native Americans' religion. However, the Court said that the Native Americans could extend their sincerely held religious beliefs to effect a "religious servitude" on as much land as they saw fit. The judiciary would not be in a position to say that the religious claim was insincere. However, to allow the Native Americans to withdraw public lands from development coextensively with their changing beliefs would grant them too much power to disrupt government pro-

cesses. *Id.* at 452–54, 108 S.Ct. at 1327–29; *accord Bowen v. Roy*, 476 U.S. 693, 701–02, 106 S.Ct. 2147, 2152–53, 90 L.Ed.2d 735 (1986) (Part III of Chief Justice Burger's opinion, with which only a plurality concurred).

■ We recognize from *Lee* and *Lyng* a central aspect of the free exercise clause analysis. The Court balances the interests of the state against the individual's interests. This approach appears to have been changed in the court's most recent pronouncement.

*Smith II* is the latest significant exposition of the Court's analysis of the free exercise clause. Two workers who were members of the Native American Church ingested peyote pursuant to a sincerely held religious belief, and their employer fired them for doing so. The Oregon unemployment compensation agency denied the members' compensation claims, saying the employer fired the workers for conduct contrary to the employer's interests. The Court affirmed the agency's decision.

In doing so, the Court first stated that laws intended to restrict worship and conduct engaged in solely for religious reasons would probably be unconstitutional. *Id.* 494 U.S. at 877, 110 S.Ct. at 1599, 108 L.Ed.2d at 885. However, the Court further stated that historically the rule has been that the free exercise clause has not provided a refuge from the force of generally applicable laws. *Id.* at 879, 110 S.Ct. at 1600, 108 L.Ed.2d at 886 (citing, *e.g.*, *Gillette v. United States*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) (military selective service statutes) and *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878) (polygamy statute)). The court then discussed and limited the exceptions to this rule.

The Court first limited many of its prior holdings to situations in which the individual claimed "hybrid" rights, that is, a claim that state action infringed the free exercise right and another constitutional right. *Smith II*, 494 U.S. at 881–883, 110 S.Ct. at 1601–02, 108 L.Ed.2d at 887–88 (citing, *e.g.*, *Wisconsin v. Yoder* (right to direct chil-

dren's education together with free exercise right) and *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (right to refrain from compelled expression of state speech together with free exercise right)); *but see Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (right to disseminate religious literature involving free speech and exercise rights, subject to labor laws). Then the Court limited the balancing test of *Sherbert* and its progeny. These cases, stated the Court, involved the peculiarities associated with unemployment compensation laws. These laws provide for "individualized governmental assessment of the reasons for the relevant conduct." *Smith II*, 494 U.S. at 884, 110 S.Ct. at 1603, 108 L.Ed.2d at 889. Within that assessment, there exists an opportunity for agencies to consider individual religious exemptions from generally applicable standards for unemployment compensation. It was this process of administrative balancing of a religious claim against the necessity to retain the compensation fund that the Court reviewed in these unemployment compensation cases. *Id.* at 883, 110 S.Ct. at 1602, 108 L.Ed.2d at 888 (citing, *e.g.*, *Thomas v. Review Bd., Indiana Employment Sec. Div.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); *Sherbert v. Verner*).

After limiting the vitality of the free exercise clause to claims of "hybrid" rights, unemployment compensation, and intentionally discriminatory laws, the Court reiterated specific problems with prior cases. "There is no way out of the difficulty that, if general laws are to be subjected to a 'religious practice' exception, *both* the importance of the law at issue *and* the centrality of the practice at issue must reasonably be considered." *Smith II*, 494 U.S. at 887–888 n. 4, 110 S.Ct. at 1605 n. 4, 108 L.Ed.2d at 891 n. 4 (emphasis in original). The Court would assume a burden on both the state and the individual's religion and make a policy choice of which one would yield as a matter of law. In making its choice, the Court stated, "[G]enerally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling governmental interest." *Id.* at 886 n. 3, 110 S.Ct. at 1604 n. 3, 108 L.Ed.2d at 891 n. 3.

■ In sum, the workers involved in *Smith II* did not claim they were subjected to a law intended to restrict worship and modes of worship undertaken for religious reasons only. The workers did not claim a hybrid right. They did make a claim for unemployment compensation. However, the Court had earlier ruled that the essence of the workers' claims was not that the state agency improperly denied unemployment benefits. Actually, the claim was that they were burdened by the criminal sanctions against their conduct. *See Employment Div., Dep't of Human Resources v. Smith*, 485 U.S. 660, 670, 108 S.Ct. 1444, 1450, 99 L.Ed.2d 753 (1988) (*Smith I*). Thus, the workers' claim did not fall within any of the exceptions to the rule that the free exercise clause does not exempt individuals from generally applicable laws.

### 2. *Applying Smith II to the Present Appeal*

■ With respect to the appeal at hand, we believe *Smith II* controls. That is because the matter involves laws that are generally applicable and religion-neutral, and because the church has not presented a claim that lies within a category to which *Smith II* suggests *Sherbert* and *Yoder* remain applicable.

We first determine whether this matter involves laws that are not generally applicable and religion-neutral. The statute at issue here is Section 24–1–5(A), which states, "No health facility shall be operated without a license issued by the [division]." NMSA 1978, Section 24–1–2(D) (Repl.Pamp. 1986) defines the term "health facility" as, among other things, any "child care center." The statute does not include any mention of facilities operated by religious organizations. We find nothing within these statutes that detracts from their character as being generally applicable and

religion-neutral. We find nothing that intimates a legislative intent to discriminatorily burden religious exercise. Similarly, we find the same religion-neutral, generally applicable characteristics in the division's regulation against spanking, which simply prohibits "[p]hysical punishment of any type." New Mexico Regulations Governing Facilities Providing Day/Night Care to Children § 501(G)(1) (1987).

### a. Unemployment Compensation Claims and Other Claims Which Involve an Administrative Balancing of Interests

We next determine if this matter involves an unemployment compensation or similar claim to which the Supreme Court found the *Sherbert* and *Yoder* analyses applicable. The record indicates that a process for exemption from regulatory control might have been available to the church. New Mexico Regulations Governing Facilities Providing Day/Night Care to Children § 109 (1987). This would provide the division with the opportunity to balance the church's claim that division rules burdened the church's religious exercises with any claim of compelling state interest. In turn, the balance the division would strike would be the type reviewable under *Sherbert* and *Yoder* standards. *See Smith II.* However, we cannot apply those standards for two reasons.

First, with respect to the spanking regulation, the church never prevailed upon the division to exempt the church from that regulation. The division never had an opportunity to balance the church's free exercise claim against what the church concedes is the division's compelling interest in protecting children. *See generally State v. Corpus Christi People's Baptist Church, Inc.*, 683 S.W.2d 692 (Tex.1984), (parents' absence from children and their complete dependence on child care center for health and safety are reasons for compelling state interest). There is no balancing of interests by the division which we can review. The church's claim of burdensome regulations is not ripe for our review. *Cf. Harris v. Revenue Div. of Taxation Dep't,* 105 N.M. 721, 737 P.2d 80 (Ct.App.1987) (lack of final order means agency decision unreviewable); *accord State ex rel. Pringle v. Heritage Baptist Temple, Inc.*

Second, with respect to the necessity for a license, Section 109 of the division's regulations was written to allow accommodation for differing viewpoints. However, the accommodation has to be within a license. Section 24–1–5(A) similarly does not allow the division to balance any interests because a license is necessary in all instances. The basis of the Supreme Court's exception for unemployment claims, the existence of an administrative balancing of interests, was impossible here. The division had no discretion to allow the church to operate a child care center without a license. Thus, the division's regulatory scheme is not one to which we can apply the *Sherbert* and *Yoder* three-part analysis.

To the extent that there was an avenue for the church to convince the division to favor religious interests over a blanket rule against all spanking, the church did not take that avenue. To the extent that the church wants to operate without a license, it precludes the division from making a reviewable balance of interests. The unemployment compensation claim exception to the limitations on the free exercise clause is not available to the church.

### b. Exception for Claims of Hybrid Interests

In *Smith II,* the Supreme Court stated that the right of parents to direct the religious education of their children was a vital one. Citing *Yoder,* the Court held that a party may claim improper infringement of free exercise rights if the party can simultaneously claim infringement of the right to choose his or her children's religious education. *Smith II,* 494 U.S. at 880–882, 110 S.Ct. at 1601–02, 108 L.Ed.2d at 887–88. Here, the right at issue is whether the church can direct the care and education of its members' children as the church deems appropriate. This is similar to the claim that the *Yoder* party made in order to invoke the three-part analysis found in that case and *Sherbert.*

However, we once again find a stumbling block to the application of this exception.

In each of the cases cited by the Supreme Court in support of its hybrid rights theory, the party claiming the right was personally injured by the deprivation of the right. For instance, in *Sherbert,* the party claiming infringement of the right to direct the religious education of children was a parent of a child to whom the state law applied. In *Wooley,* the party claimed the "Live Free or Die" slogan on state motor vehicle license plates compelled him to include objectionable matters in his personal speech. In this case, there are no individuals with children in the child care center claiming a deprivation of a parent's right to direct his or her children's religious education. *See Sherbert v. Verner.* Thus, the church stands or falls on its own bare right to run a child care facility according to church doctrine, not on the rights of its member parents. We do not deal with a hybrid right in this case. It follows that we cannot apply the exception dependent on the assertion of hybrid rights.

### 3. *Free Exercise Claim Under the New Mexico Constitution*

The church urges us to consider this matter under state constitutional principles. *See* N.M. Const. art. II, § 11; N.M. Const. art. XXI, § 1. This argument was made for the first time in the supplemental briefs we ordered after oral argument. *Cf. State v. Hershberger,* 462 N.W.2d 393 (Minn.1990) (holding that Minnesotans are afforded greater protection for religious liberties against governmental action under the state constitution than under the first amendment of the federal constitution). *See generally* Utter & Pitler, *Presenting a State Constitutional Argument: Comment on Theory and Technique,* 20 Ind.L. Rev. 635 (1987); Carson, *"Last Things Last": A Methodological Approach to Legal Argument in State Courts,* 19 Willamette L.Rev. 641 (1983). We decline to consider the matter under state constitutional principles, because the claim was not made at trial, *see* SCRA 1986, 12–216, and because the claim was made so late in the

appellate process. Under these circumstances, we doubt we can do the claim justice.

### CONCLUSION

The church has raised a problem that is of increasing concern as state agencies are called upon to accept greater regulatory responsibility. *See generally* C. EsBeck, *State Regulation of Social Services Ministries of Religious Organizations,* 16 Val. U.L.Rev. 1 (1981). We are not persuaded on the record before us that as a matter of federal constitutional law the church is entitled to the relief it seeks. The state constitutional claim not having been raised, we affirm on the basis of federal constitutional analysis.

Affirmed.

IT IS SO ORDERED.

BIVINS and MINZNER, JJ., concur.